**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Vickey Sarantis, a single woman, | No. CV-06-2153-PHX-DGC |
| Plaintiff, | **ORDER** |
| vs. | |
| ADP, Inc., a foreign corporation, | |
| Defendant. | |

Defendant has moved for summary judgment. Dkt. #84. Plaintiff has responded and Defendant has replied. Dkt. ##93, 101. No party has requested oral argument. For the reasons set forth below, the Court will grant the motion in part and deny it in part.[1]

**I.     Factual Background.**

In addressing Defendant's summary judgment motion, the Court must accept Plaintiff's evidence as true and view the facts in the light most favorable to Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The following statement of the facts reflects that requirement.[2]

---

[1] Plaintiff's papers fail to comply with the font and type-size requirements of the Court's local rules. *See* LRCiv 7.1(b)(1). Plaintiff's counsel should comply with these requirements in all future filings.

[2] Defendant objects to many of Plaintiff's factual assertions as based on inadmissible evidence. Dkt. #101. The following description of facts does not rely on those assertions.

**A.    Plaintiff's Duties and Performance.**

In late July of 2002, Plaintiff Vickey Sarantis began working as a sales representative for Defendant ADP, Inc. Dkt. #85 ¶1. Scott Kaiden was Plaintiff's supervisor. Kaiden reported directly to Kenneth Olden, Defendant's Area Vice President for Sales. *Id.* at ¶¶3-4. Plaintiff joined ADP near the start of Defendant's 2003 fiscal year ("FY"), which ran from July 1, 2003 through June 30, 2004. *See id.* at ¶8. Defendant established sales quotas for its sales representatives for each fiscal year. *Id.* at ¶9.

In November of 2002, after serving as a sales trainee, Plaintiff became responsible for selling "Time and Labor Management" ("TLM") products to "up-market" clients – entities with one hundred employees or more. *Id.* at ¶¶10-11. Defendant restructured its business model for FY 2004, and Plaintiff became responsible for selling "Time and Attendance" and "Expense Expert" products to mid-market clients – entities with fifty to ninety-nine employees. *Id.* at ¶¶12, 14. Because Plaintiff's sales commissions in dealing with mid-market clients were expected to be lower, Plaintiff and Defendant jointly selected approximately twenty-two up-market clients to whom she would still be allowed to sell TLM products. *Id.* at ¶16. Plaintiff asserts that she was promised by Olden that she could retain these more lucrative clients permanently. Dkt. #99, Ex. 2 ¶¶33-34. Plaintiff almost reached her sales quota for FY 2004, achieving 91% of her expected sales numbers. Dkt. #85, ¶26.

For FY 2005, Plaintiff was allowed to sell two additional products – "COBRA" and "FSA" – to mid-market clients. *Id.* at ¶17. Plaintiff's sales quota for FY 2005 was decreased from the previous fiscal year and Plaintiff achieved 141% of her quota. *Id.* at ¶27.

For FY 2006, Plaintiff was permitted to sell only to mid-market clients, but was permitted to sell Defendant's "full range of products in the mid market." *Id.* at ¶¶21-22. Plaintiff contends that she lost her up-markets clients because she refused Olden's sexual advances. Dkt. #99, Ex. 2 ¶33-34.

Plaintiff's sales figures for FY 2006 were significantly lower than her sales quota. Dkt. #85, ¶34. On December 1, 2005, Plaintiff received a verbal warning from Kaiden regarding her sales performance. *Id.* at ¶37. On April 4, 2006, Kaiden issued a formal

1  written warning to Plaintiff and placed her on six-months' probation.  *Id*. at ¶45.

2  **B.    Allegations of Sexual Harassment.**

3  Starting in 2004, Plaintiff was subjected to "humiliating leers and degrading
4  comments from Olden and others" and began receiving "sexually-suggestive e-mails,
5  telephone calls and direct verbal comments" from Olden.  Dkt. #99, Ex. 2 ¶¶19-20.

6  **1.    Emails.**

7  In a September 24, 2004, email discussing company receipts, Olden stated to Plaintiff:
8  "I am trying to say without asking that taking me out for lunch can be expensed to[o].  Get
9  the hint."  Dkt. #85, Ex. 8.

10  On September 28, 2004, Olden sent an email to Plaintiff with "You can run" in the
11  subject line and "but you cant [sic] hide" in the text.  *Id*. Ex. 9.

12  On November 30, 2004, Olden sent an email to Plaintiff saying  "I had to buy some
13  knee braces to stop buckling.  I would like to go back and visit the conversation about the
14  other side your [sic] holding back on."  *Id*. Ex. 14.

15  On December 13, 2004, Olden sent Plaintiff an email with the subject "How do I get
16  in."  *Id*. Ex. 15.  Plaintiff responded, "Get in?????"  *Id*.  Olden responded, "get in the game."
17  *Id*.  Plaintiff responded, "what game?"  Olden replied, "your [sic] the game."  *Id*.[3]

18  On March 9, 2005, Plaintiff emailed Olden asking if they should reschedule a meeting
19  for "another day?"  *Id*. Ex. 16.  Olden responded "another day or location?"  *Id*.

20  On June 21, 2005, Olden forwarded an email to Plaintiff in which Olden ostensibly
21  stood up for Plaintiff along with the message "I can't wait to see what I get."  *Id*. Ex. 17.

22  **2.    Physical Incident.**

23  In January of 2005, as Plaintiff and Olden were passing in a hallway at work, Olden
24  grabbed Plaintiff, put his hand on her buttocks, and pulled her body into his body "in a sexual

25

26  [3]Plaintiff testified in her deposition that she viewed the emails she received before
   January 2005 as "harmless."  Dkt. #85, ¶¶92-93.  While this might mean that they were not
27  subjectively offensive for purposes of Plaintiff's sexual harassment claim, they nonetheless
   are relevant to understanding Plaintiff's reaction after the January 2005 physical incident
28  (discussed below) and Olden's course of conduct over time.

- 3 -

1  way." Dkt. #99 Ex. 2 ¶27. Plaintiff "immediately pushed [Olden] away and ran to [her]
2  cubicle and grabbed [her] keys and headed out to the parking lot[.]" *Id*. Once she returned
3  to the office, Plaintiff told Olden that she would go to human resources if he did not stop
4  harassing her. *Id*. at ¶28. Olden replied: "You know that you like it. Stop fighting it." *Id*.

5             **3.**    **Voicemails.**

6  On January 4, 2005, Olden left a voicemail message on Plaintiff's phone stating that
7  "It was very very nice to see you in your riding gear yesterday. I thought that was a
8  marvelous giddy-up, giddy-up type outfit." Dkt. #99 Ex. 2 ¶26; *see also* Dkt. #85 Ex.1.G.

9  On January 19, 2005, Olden left a voice mail message in which he stated he was
10 imagining Plaintiff "face down [on a] pillow. I don't even want to think about what's
11 happening right now. It'll give me something to do. It's a pretty good thought I got. I'm
12 just going to think here for a little bit more. Oh boy, I hope that's happening cause that really
13 does – all right anyway." Dkt. #99 Ex. 2 ¶26; *see also* Dkt. #85 Ex.1.G.

14 On February 11, 2005, Olden complained that Plaintiff and he "started, you know
15 actually doing some physical touching" and were "moving in the right direction," but now
16 "I don't even get a wave anymore, and I'm just ignored. I know what's coming, you're
17 breaking up with me. That's fine. See ya." Dkt. #99 Ex. 2 ¶26; *see also* Dkt. #85 Ex.1.G.

18            **4.**    **Las Vegas Conference.**

19 In June of 2005, Plaintiff, Olden, and other sales staff attended a conference in Las
20 Vegas. Olden saw Plaintiff in the hotel walkway and asked if he could follow her to her
21 hotel room. Dkt. #99 Ex. 2 ¶30. During the conference Olden also asked Plaintiff to change
22 her return flight to the day after the conclusion of the meetings and to fly back to Arizona
23 with him alone. *Id*. Plaintiff received four text messages from Olden during the Las Vegas
24 trip: "PLAY BALL?", "MISSED R SPOT," "SAD MISS I FLY U IN W ME," "MAYBE?"
25 *Id*.; *see also* Dkt. #85 Ex. 1.H.

26     **C.**    **Plaintiff's Complaints and Defendant's Investigation.**

27 On April 4, 2006, after receiving the written warning from Kaiden regarding her
28 disappointing sales performance, Plaintiff complained to Maryann Zimmerman, an ADP

1 human resources staff member, about Olden's behavior. Dkt. #99 Ex. 2 ¶49. Plaintiff filed formal charges of discrimination with the EEOC on April 14 and June 12, 2006. *Id*. at ¶51; Dkt. #5 ¶47. On or around April 4, 2006, Zimmerman contacted Richard Domanski, ADP's Vice President of Human Resources, and informed him of Plaintiff's sexual harassment complaint against Olden. Dkt. #85 Ex. 2 ¶2. In the following weeks, Domanski and others conducted an investigation of the complaint. *Id*. at ¶7. As a result of the investigation, Olden was terminated on April 28, 2006. *Id*. at ¶10.

### D.  Plaintiff's Termination.

On April 18, 2006, after Plaintiff had complained to Zimmerman and filed her first EEOC charge, Kaiden terminated Plaintiff. Dkt. #99 Ex. 2 ¶52. Kaiden told her that he was doing so at Olden's direction. *Id*. Kaiden accompanied Plaintiff to her cubicle to retrieve her keyfob, laptop, and badge. *Id*. Plaintiff packed her things and left the office. *Id*. at ¶54. When Plaintiff contacted Zimmerman about the termination, Zimmerman informed Plaintiff that she had not been terminated. Dkt. #85 Ex. 1 at ¶21.

On September 7, 2006, Plaintiff filed suit against ADP, Olden, and his wife. Dkt. #1. Plaintiff filed a second amended complaint on September 21, 2006. Dkt. #5. In the course of discovery, ADP learned that in June of 2006 Plaintiff forwarded confidential proprietary information to individuals outside of ADP. Dkt. #85 at ¶99. Plaintiff acknowledged in her deposition that this disclosure constituted a violation of ADP policy, though she stated that she felt the need to maintain records of the information and that she had lost trust in those at ADP. Dkt. #85, Ex. 4 92:20-93:4, 102:16-24. ADP also learned that Plaintiff was terminated by a previous employer even though Plaintiff stated on her June 25, 2002, employment application that she left her previous employer because she "went into management" at another company. *Id*. at ¶100; Dkt. #54 at 2. As a result of Plaintiff's unauthorized disclosure of confidential information and the misrepresentation on her employment application, ADP terminated Plaintiff on May 29, 2007. Dkt. #85 at ¶¶102, 103.

On June 6, 2007, the Court issued a temporary restraining order ("TRO") requiring ADP to reinstate Plaintiff to her former position. Dkt. #44. On June 26, 2007, following an

- 5 -

1  evidentiary hearing, the Court denied Plaintiff's application for a preliminary injunction and
2  terminated the TRO. Dkt. #54. Plaintiff was fired the same day. Dkt. #85 at ¶104.

3  **II.     Plaintiff's Second Amended Complaint.**

4  Plaintiff alleges that Olden's behavior constitutes sexual harassment in violation of
5  Title VII of the Civil Rights Act of 1964. Dkt. #5. Plaintiff further contends that ADP
6  retaliated against her in violation of Title VII by changing her account responsibilities so that
7  her sales performance would suffer and by terminating her. *Id.* Plaintiff also brings three
8  state law claims – intentional infliction of emotional distress, negligent retention, and
9  negligent supervision. *Id.* Plaintiff seeks compensatory and punitive damages and injunctive
10 relief. *Id.* The parties stipulated to dismiss Olden and his wife from the suit. Dkt. #90. ADP
11 is the only remaining Defendant.

12 **III.    Legal Standard.**

13 Summary judgment is appropriate if the evidence, viewed in the light most favorable
14 to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and
15 that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see*
16 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Only disputes over facts that might
17 affect the outcome of the suit . . . will properly preclude the entry of summary judgment."
18 *Anderson*, 477 U.S. at 248. The disputed evidence must be "such that a reasonable jury
19 could return a verdict for the nonmoving party." *Id.*

20 **IV.     Sexual Harassment.**

21 Title VII provides that an employer may not "discriminate against an individual with
22 respect to [her] compensation, terms, conditions, or privileges of employment because of
23 [her] . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). Sexual harassment constitutes unlawful
24 discrimination under Title VII. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986).

25       **A.      Hostile Work Environment.**

26 A plaintiff may establish a claim under Title VII by proving that sexual harassment
27 created a hostile work environment. *See id.* at 66-67. To establish a hostile work
28 environment, Plaintiff must prove that (1) she faced verbal or physical conduct, (2) the

1 conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the
2 terms and conditions of her employment and create an abusive work environment. *See Rene*
3 *v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) (en banc).

### 1. Verbal and Physical Conduct.

Defendant does not dispute that Plaintiff has satisfied this requirement. Olden clearly engaged in verbal and physical conduct toward Plaintiff.

### 2. Was the Conduct Unwelcome?

Citing examples of Plaintiff's sexual bantering with Olden, Defendant contends that Olden's conduct was not unwelcome. For example, on August 23, 2004, Olden sent an email to Plaintiff asking if Plaintiff's flight to Las Vegas was for "our trip." Dkt. #85 Ex. 19. Plaintiff responded "Like I said in Vegas 'All talk and no action.'" *Id*.

In response to Olden's September 24, 2004, email about lunch between Olden and Plaintiff, Plaintiff said "How about next Thursday about 8:00pm?? Oh my mistake........... that would be dinner wouldn't it?" *Id*. Ex. 21.

As part of the September 2004 email communications concerning running and hiding, Plaintiff said "for both of our own good you'd better hope I don't come out of hiding!!!!!!!!!!!" *Id*. Ex. 22 at 2. Olden then replied, "I recommend coming out of hiding. . . . Don't hide." *Id*. He further stated that he "will need to get in better shape," to which Plaintiff said, "your shape looks fine to me........... (very fine)!!!!!!!!!!!!!!!!!!" *Id*.

In response to a July 14, 2005, email from Olden to sales staff regarding a party that was to be held at Olden's house and that would "be done around 4am," Plaintiff said, "4am........ that's past my bedtime; is this a pajama party?" *Id*. Ex. 23.

Plaintiff asserts that Olden's conduct was unwelcome, but that she played along with him on the advice of a co-worker and because Olden was a powerful and influential officer of the company. Dkt. #99, Ex. 2 ¶20. Plaintiff has provided the declaration of Jennifer Adams confirming that Plaintiff consulted her about Olden's inappropriate behavior and that Adams advised Plaintiff to remember that Olden was the boss and nobody ever challenged him. *Id*. Moreover, Plaintiff's reaction to Olden's physical contact clearly reflected that it

- 7 -

1 was unwelcome. *See id.* at ¶¶27-28.

2 The Court concludes that a dispute of material fact exists on the question of whether Olden's conduct was unwelcome. The jury must make that decision.

### 3. Was the Conduct Severe or Pervasive?

To determine whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citation and internal quotes omitted). The work environment "must be both objectively and subjectively offensive, one that a reasonable [woman] would find hostile or abusive, and one that [Plaintiff] in fact did perceive to be so." *Id.* at 787.

The Ninth Circuit recently addressed this element of a sexual harassment claim in *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047 (9th Cir. 2007). The harasser in *Craig* made repeated and inappropriate comments about the plaintiff's legs and said that she should wear shorter skirts, asked her at an after-work meeting if she wanted to make love to him and told her that he would like to take off her dress, followed her into the lady's room at a restaurant and kissed her as she came out of the stall, called her at home the same night, called her one week later and told her that she was beautiful and that he would like to take her out for a drink, called her from a hotel room in Wisconsin and again asked if she would make love to him, and told her later that month that he wanted her and that she had told him she wanted to make love to him. *Id.* at 1051-52. The Ninth Circuit found this evidence sufficient to establish a *prima facie* case under Title VII, stating that it had found liability in situations that were "much less onerous." *Id.* at 1056. The Court of Appeals found that the harasser's conduct "falls somewhere between mere isolated incidents or off-hand comments, which do not amount to a Title VII claim, and serious and pervasive harassment that clearly comes within Title VII." *Id.* (citations omitted).

The Ninth Circuit emphasized that the harasser in *Craig* was the plaintiff's supervisor

1  and that this position "made his actions emotionally and psychologically threatening." *Id.*
2  The Court noted that "repeated pressure to perform sexual favors for one's boss is certainly
3  more coercive than the misguided" actions of a co-worker. *Id.* Viewed from the perspective
4  of a "reasonable woman," the Ninth Circuit explained, the harasser's behavior "could be
5  understood to be so obnoxious that it unreasonably interferes with work performance and,
6  consequently, can alter a condition of employment and create an abusive working
7  environment." *Id.* at 1056-57 (quotation marks and citation omitted).

8  The Ninth Circuit also noted that the plaintiff in *Craig* alleged that she was removed
9  from many of her duties, received budgets late, had some of her duties reassigned, and was
10 forced to interact with the harasser despite his continued propositions. These additional
11 stresses in the work place made the plaintiff nervous, spawned anxiety attacks, and affected
12 her health. *Id.* at 1057. The Ninth Circuit found that although these complaints, standing
13 alone, might not satisfy the Title VII requirement, "in the aggregate, they are sufficiently
14 serious to amount to an alteration of her condition of employment." *Id.*

15 The facts of this case are similar to those in *Craig*. Olden was Plaintiff's boss and an
16 influential executive in Defendant's operation. He engaged in repeated, suggestive
17 communications with Plaintiff in the form of emails, voicemails, and text messages. He
18 physically assaulted Plaintiff on one occasion, as did the supervisor in *Craig*, and he directly
19 propositioned Plaintiff while at the Las Vegas convention. Plaintiff further asserts that Olden
20 eliminated her up-market clients, established a working assignment that assured her failure,
21 and terminated her through Mr. Kaiden, all of which are said to have caused serious stress
22 and emotional harm as in *Craig*. *See* Dkt. #99, Ex. 2 ¶¶61, 64; *see id.*, Ex. 7. Plaintiff has
23 presented sufficient evidence to create a genuine issue of fact as to whether she was
24 subjected to severe or pervasive conduct that altered the conditions of her employment. The
25 Court does not know whether Plaintiff will prevail on these claims at trial, but concludes that
26 a jury must resolve these factual issues.[4]

27

28  [4] Defendant argues that Olden's conduct was simply too infrequent and too mild to amount to sexual harassment. The Court does not agree. Between January and June of 2005,

### B.     *Faragher/Ellerth* **Affirmative Defense.**

"Under Title VII, there is a presumption that an employer is vicariously liable for a hostile environment created by a supervisor." *El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1074 n.2 (9th Cir. 2005) (internal quotes and citation omitted).  An employer may avoid liability, however, if it shows by a preponderance of evidence that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer[.]"  *Faragher*, 524 U.S. at 807; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

With respect to the first element of the defense, "an employer's adoption of an anti-harassment policy and its efforts to disseminate the policy to its employees establish that [the employer] exercised reasonable care to prevent sexual harassment in the workplace." *Hardage v. CBS Broadcasting, Inc.*, 427 F.3d 1177, 1185 (9th Cir. 2005) (internal quotes and citation omitted).  Here, Defendant promulgated a sexual harassment policy.  Dkt. #85 ¶46.  The policy describes prohibited sexual conduct, enforcement of the policy, and the company's internal complaint procedure, among other things.  Dkt. #85 Ex. 1.E.  Plaintiff does not dispute that she received a copy of the policy on her first day of work for ADP.  Dkt. #85 Ex. 1 ¶7; *id.* at Ex. 1.F.

As part of the first prong of the *Faragher/Ellerth* affirmative defense, Defendant must also demonstrate that it took reasonable steps to promptly correct Plaintiff's complaint of sexual harassment.  *Hardage*, 427 F.3d at 1185-86.  Here, the record shows that Zimmerman put in motion the investigative process the same day that Plaintiff complained to her, that ADP investigated the situation for a few weeks, that the investigation involved upper-level management, and that the investigation culminated in Olden's termination less than one month after Plaintiff complained.

---

Olden sent Plaintiff nine suggestive communications by email, voicemail, or text-message, physically assaulted her at the office, and directly propositioned her in Las Vegas.  Such conduct by the Area Vice President for Sales could be viewed by a reasonably jury as severe or pervasive and sufficient to alter the terms of Plaintiff's employment.

- 10 -

In the second element of the defense, Plaintiff must have unreasonably failed to take advantage of Defendant's corrective or remedial opportunities. *See Faragher*, 524 U.S. at 806-07 ("If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so."). "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* at 807-08; *Ellerth*, 524 U.S. at 765.

Here, Plaintiff claims that the first instance of sexually charged behavior occurred in August of 2004. Plaintiff did not complain of the harassment until April 4, 2006 (Dkt. #99 Ex. 2 ¶49) – approximately twenty months later. This time difference suggests that Plaintiff did not undertake reasonable steps to take advantage of Defendant's corrective measures. *See Hardage*, 427 F.3d at 1188 (finding such evidence where there was a gap of six months between the first instance of sexual harassment and the plaintiff's complaint); *see also Craig*, 496 F.3d at 1058 (contrasting "a delay of a mere seven days" with "cases where victims have allowed the harassment to continue for a period of months or years before finally reporting it to the appropriate authority."). Plaintiff has not presented any evidence that extenuating circumstances prevented her from invoking the ADP harassment policy in a timely fashion. She alleges that she did not report the harassment because of a fear that she would be retaliated against. *See* Dkt. #99 Ex. 2 ¶17. Were it not for the fact that the defense cannot support summary judgment for reasons stated in the next paragraph, the Court might be inclined to conclude that this explanation is inadequate. There is no evidence, for example, that other employees suffered a tangible employment action for charging supervisors with sexual harassment. Because the Court concludes that this affirmative defense must be presented to jury, however, the Court likewise concludes that the jury must decide whether Plaintiff acted reasonably in availing herself of Defendant's policy.

The *Faragher/Ellerth* affirmative defense generally is unavailable where the plaintiff-

employee is subject to a tangible employment action. *See Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. Plaintiff claims that her up-market clients were removed and her workload adjusted to ensure failure because of her rejection of Olden's sexual advances. After the clients had been removed by Kaiden, Plaintiff ran into Olden in a copy room. She asked Olden why she had lost the up-market accounts. Dkt. #99, Ex. 2 ¶42. Olden responded: "You never did anything for me. You had plenty of chances and time to give something back to Uncle Ken and you never did." *Id*. In addition, Plaintiff asserts that she was fired by Kaiden, on Olden's orders, because she refused to give in to Olden's demands. *Id*. at ¶52. Although Zimmerman reversed the action and told Plaintiff that she was not terminated, an employer that reverses an adverse employment action may still be subject to liability. *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). Whether these actions amounted to tangible employment actions, and whether they were undertaken as a result of Olden's sexual advances toward Plaintiff, are jury questions. The Court therefore cannot grant summary judgment despite the fact that Defendant has presented significant evidence concerning its anti-harassment policies, its prompt response to Plaintiff's complaint, and Plaintiff's apparent failure to reasonably avail herself of those policies. The availability of the *Faragher/Ellerth* affirmative defense must be decided by the jury at trial.[5]

**V.     Retaliation.**

Title VII "prohibits retaliation against an employee 'because [she] has opposed any practice made an unlawful employment practice by [the statute].'" *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1082 (9th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)). A plaintiff makes a *prima facie* case of unlawful retaliation by producing evidence that she engaged in activity protected by Title VII, that the employer subjected her to a materially adverse action, and that there was a causal link between the protected activity and the adverse action. *See*

---

[5]In the Ninth Circuit, "an employer may still assert the affirmative defense if the tangible employment action was unrelated to any harassment or complaint thereof." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th Cir. 2004) (internal quotes and citation omitted). Whether the actions described above were unrelated to Olden's harassment must be decided by the jury.

- 12 -

1  *Vasquez v. County of L.A.*, 349 F.3d 634, 642 (9th Cir. 2004).

2  Plaintiff alleges that she was retaliated against because she refused to give in to
3  Olden's sexual advances, complained to Defendant's human resources department, filed a
4  charge of discrimination with the EEOC, and filed this suit. *See* Dkt. #5. She claims that the
5  retaliatory measures include the modification of her responsibilities, particularly the removal
6  of her up-market accounts, which set her up to perform inadequately in terms of sales, her
7  termination by Kaiden, and her ultimate termination after the TRO was lifted. *See id.* For
8  reasons explained above, the Court finds that factual issues preclude summary judgment on
9  this question. Viewed in the light most favorable to Plaintiff, the evidence suggests that
10 Plaintiff's job responsibilities were modified during the course of Olden's sexual advances,
11 Olden suggested that Plaintiff lost the up-market accounts because she refused to respond to
12 his advances, Kaiden terminated Plaintiff at Olden's direction, and Plaintiff's termination
13 occurred while this lawsuit was underway. A jury must decide whether these actions were
14 undertaken because of Plaintiff's protected activity.

15 **VI.    State Law Causes of Action.**

16 Without citation to any legal authority or reference to any particular facts, and armed
17 only with speculation as to what "will" be proved at trial, Plaintiff seeks relief under theories
18 of intentional infliction of emotional distress, negligent supervision, and negligent retention.
19 Dkt. #93 at 17. The Court will grant summary judgment on these claims.

20 In Arizona "an employer is rarely liable for intentional infliction of emotional distress
21 when one employee sexually harasses another. Liability for the employer typically attaches
22 only when a company utterly fails to investigate or remedy the situation." *Craig*, 496 F.3d
23 at 1059. As noted above, Defendant promptly investigated the matter and terminated Olden
24 as a result. Moreover, Plaintiff has not presented evidence of the extreme and outrageous
25 behavior by Defendant that is required for an intentional infliction claim in Arizona. *Id.*

26 Plaintiff's negligent supervision and retention claims focus on Defendant's conduct
27 – on its hiring of Olden, its supervision of his activities, and its response to Plaintiff's
28 complaints. Unless Plaintiff shows "willful misconduct" on the part of Defendant, these

claims are barred under Arizona law by the remedy of workers compensation. *Id*. at 1060. Plaintiff has failed to present evidence of "willful misconduct" by Defendant.

**IT IS ORDERED:**

1. Defendant's motion for summary judgment (Dkt. #84) is **denied** with respect to Plaintiff's Title VII claims and **granted** with respect to Plaintiff's state law claims.

2. The Court will set a final pretrial conference by separate order.

DATED this 15th day of April, 2008.

*David G. Campbell*
United States District Judge